UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES—GENERAL

**Case No. CV 16-1947-MWF (JEMx)** **Date: September 20, 2017**
Title: Sunil Sudunagunta -*v*.- NantKwest, Inc., et al.

Present: The Honorable MICHAEL W. FITZGERALD, U.S. District Judge

Relief Deputy Clerk: Cheryl Wynn
Court Reporter: Not Reported

Attorneys Present for Plaintiff: None Present
Attorneys Present for Defendant: None Present

**Proceedings (In Chambers):** ORDER RE MOTION TO DISMISS CONSOLIDATED THIRD AMENDED COMPLAINT [113]

Before the Court is Defendants NantKwest, Inc. ("NantKwest"), Patrick Soon-Shiong, Richard Gomberg, Barry Simon, Steve Gorlin, Michael Blaszyk, Henry Ji, Richard Kusserow, John Potts, Jr., Robert Rosen, and John Thomas, Jr.'s (collectively, the "NantKwest Defendants") Motion to Dismiss Consolidated Third Amended Complaint (the "Motion), filed July 31, 2017. (Docket No. 113). Defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., Citigroup Global Markets, Inc., Jefferies LLC, Piper Jaffray & Co., and MLV & Co., LLC (collectively, the "Underwriter Defendants") joined the NantKwest Defendants' Motion on July 31, 2017. (Docket No. 115). Lead Plaintiffs Donald Hu and Brayton Li filed an Opposition on August 17, 2017. (Docket No. 116). Defendants replied on August 28, 2017. (Docket No. 118). The Court has read and considered the papers filed on the Motion and held a hearing on **September 11, 2017**.

The Motion is **DENIED.** The Consolidated Third Amended Complaint addresses all of the Court's previous concerns, and sufficiently pleads both material omissions from the Registration Statement and scienter on the part of Defendants. Viewed holistically, the Consolidated Third Amended Complaint pleads a detailed theory that Soon-Shiong and his associates hid the true extent of his executive compensation and dealings with his own, related companies, in an attempt to make NantKwest more appealing to investors during the IPO. Defendants allegedly earned

healthy profits at the expense of their investors, who were misled as to the true state of NantKwest's financials.

As the Court noted at the hearing, the issue is not so much whether the pleading standards are met — the deficiencies of the prior complaint have been corrected, so if the pleading standards are not met, the error was in the last Order. Rather, it seems that Defendants more argue (as they have every right to do) that the various documents simply disclose no actionable misrepresentations ***as a matter of law***, similar to what they would argue on summary judgment, after trial, or on appeal. The Court neither views the case law as supporting Defendants' arguments nor views the truthfulness of the representations as being legal rather than factual.

## I. BACKGROUND

On a motion to dismiss, the Court assumes the facts alleged in the complaint are true and construes any inferences arising from those facts in the light most favorable to the plaintiff. *See, e.g.*, *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 704 (9th Cir. 2016) (restating generally-accepted principle that "[o]rdinarily, when we review a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we accept a plaintiff's allegations as true 'and construe them in the light most favorable' to the plaintiff") (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009)). The Court thus accepts the following facts as true:

Defendant Dr. Patrick Soon-Shiong is a sophisticated businessman, with a net worth of about $8.6 billion and a long history as a major player in the pharmaceutical industry. (Consolidated Third Amended Complaint ("CTAC") ¶ 46 (Docket No. 112)). In 2001, Soon-Shiong founded a company he called Abraxis Bioscience. (*Id.* ¶ 47 n.7). In 2007, Soon-Shiong restructured Abraxis Bioscience into two publicly traded companies: Abraxis Bioscience, Inc. ("Abraxis Bioscience"), and Abraxis Pharmaceutical Products, Inc. ("Abraxis Pharmaceutical"). (*Id.*). In 2008, Soon-Shiong sold Abraxis Pharmaceutical to German healthcare conglomerate Fresenius SE for $4.6 billion in cash and stock. (*Id.* ¶ 47 n.7). In 2010, Soon-Shiong sold Abraxis

Bioscience to a company called Celgene, one of the world's largest biopharmaceutical companies, for $2.9 billion in cash and stock. (*Id.* ¶ 47).

Since the sale of Abraxis Bioscience, Soon-Shiong has been the largest individual shareholder in Celgene — and Celgene has invested heavily in Soon-Shiong's businesses. (CTAC ¶ 48). In April 2011, Celgene entered into a contribution agreement with Soon-Shiong's charitable foundation, the Chan Soon-Shiong Institute for Advanced Health ("CSS Institute"), in which Celgene made an upfront contribution to the CSS Institute valued at $41 million, and further agreed to make contingent matching contributions up to $75 million, in exchange for a right of first refusal for any oncology drugs CSS Institute developed or licensed. (*Id.* ¶ 48).

Also in 2011, Soon-Shiong founded NantWorks, an umbrella under which several "Nant-" branded startup companies were founded, including NantBiosciences, NantHealth, NantCell, and NantOnomics. (CTAC ¶ 49). In January 2014, Celgene entered into a strategic collaboration agreement with NantBiosciences, under which Celgene made a $75 million upfront investment in NantBiosciences and licensed two molecules to the company, in exchange for the option to purchase certain drugs then in development by NantBiosciences. (*Id.* ¶ 50). Later, in June 2014, Celgene invested $25 million in another NantWorks affiliate, NantHealth. (*Id.* ¶ 51).

**<u>Events Leading Up to the NantKwest IPO</u>**

Defendant NantKwest, originally called Conkwest, is another Nant-branded entity, a development-stage immunotherapy company whose mission is to harness "natural killer" cells generated by the human immune system to treat cancer, infectious diseases, and inflammatory diseases. (CTAC ¶ 2). Over the course of 2014 and 2015, Soon-Shiong engaged in a series of complicated transactions using his related entities to gain control of NantKwest. (*Id.* ¶¶ 4, 53–56). In March 2015, Soon-Shiong became Chief Executive Officer of NantKwest and sole Chairman of the Board of Directors. (*Id.* ¶¶ 4, 56).

In February and March 2015, Soon-Shiong and his associate, Defendant Henry Ji, who Soon-Shiong had previously named a Director of NantKwest, formed a holding

company called InexBio Holdings LLC. (CTAC ¶¶ 30, 54 57). InexBio Holdings LLC then acquired a controlling stake in Inex Bio, an unprofitable development-stage pharmaceutical company, from third party stockholders for $1.1 million. (*Id.* ¶ 57). Later in March, Soon-Shiong and Ji negotiated a series of related-party transactions to sell their interests in Inex Bio to NantKwest for $6.5 million in cash, as well as warrants to purchase 2,609,520 shares of NantKwest Class A common stock for $2 per share. (*Id.*). Soon-Shiong and Ji promptly exercised their warrants, and both obtained a personal benefit from these transactions. (*Id.*). In its 2015 Form 10-K, NantKwest indicated that it absorbed losses associated with Inex Bio on its consolidated balance sheet. (*Id.*).

On March 24, 2015, NantKwest granted Soon-Shiong a common stock purchase warrant. (CTAC ¶ 58). NantKwest's FY 2015 Form 10-K explains that initially, the warrants granted Soon-Shiong 17,589,250 shares of common stock (as calculated according to the 1.8515:1 forward split of common stock prior to the IPO). (FY 2015 Form 10-K at 523). The warrants had an exercise price of $2.00 per share, a three-year term, and were to vest according to the achievement of certain performance-based milestones. (*Id.*).

On May 8, 2015, one month prior to filing the Registration Statement, NantKwest agreed to modify Soon-Shiong's options and warrant package. (FY 2015 Form 10-K at 523). Pursuant to the amendments, the Warrant's vesting conditions changed from a purely performance-based model to a combination of service-based and performance-based conditions. (*Id.*). The performance-based milestones themselves were also modified from the previous milestones. (*Id.*). Among the milestones were

> 4,500,000 Warrant Shares to vest upon the closing of a transaction between [NantKwest] and an internationally recognized pharmaceutical, specialty pharmaceutical, or biotechnology company with annual sales of at least $5 billion (a "Strategic Partner"), during the term of [Soon-Shiong's] service as CEO or Chairman of [NantKwest], in which a Strategic Partner invests at least US$20 million in shares of [NantKwest] capital stock at or above a pre-money valuation of $1.5 billion.

(Ex. 10.16 to Form S-1, filed with the SEC on June 19, 2015) (quoted verbatim without adjustment to reflect pre-IPO stock split).

The stated strike price for each of these warrants was $3.70, or approximately $2.00 after giving effect to the July 10, 2015 1.8515-to-1 forward split. (CTAC ¶ 58). The modified warrant agreement was later attached to NantKwest's Registration Statement as Exhibit 10.16; however, it was backdated to March 24, 2015, did not reference the May 8 modification, and did not disclose that the largest grant condition was already probable, if not already a done deal. (CTAC ¶ 58).

However, the satisfaction of this milestone was already probable, if not certain, by May 8, 2017, when NantKwest, Soon-Shiong, and Defendant Directors and Compensation Committee members Kusserow, Potts, and Rosen agreed to the modification. (CTAC ¶ 60). Not only did Soon-Shiong have an extensive history with Celgene, including numerous investments in Soon-Shiong's entities in amounts greater than $20 million, but Soon-Shiong was Celgene's largest individual investor. (*Id.*). Indeed, Celgene repeatedly made public statements indicating its desire to invest in Soon-Shiong's "vision." (*Id.*).

And Celgene did indeed make two investments in NantKwest soon after the May 8, 2015 modification, indicating that preliminary discussions regarding a strategic investment had already taken place. (*Id.*). On June 10, 2015, NantKwest sold $71 million of shares in a private placement, including a $7,999,979.30 investment by a subsidiary of Celgene. (CTAC ¶ 67). On July 9, 2015, NantKwest entered into a second private placement agreement with the same subsidiary, which agreed to purchase an additional $17 million of NantKwest shares concurrent with NantKwest's IPO. (*Id.* ¶ 70).

Also in May 2015, Soon-Shiong entered into a Related-Party Lease arrangement with NantWorks to lease about 9,500 square feet of space in the Culver City, California facility in which Soon-Shiong kept his personal office, and that serves as a headquarters for Soon-Shiong's entities, including Cambridge, NantWorks, and NantHealth. (*Id.* ¶ 62). Because NantKwest needed a laboratory configuration, millions of dollars of structural conversions were made, for which NantKwest was

liable. (*Id.* ¶ 63). Confidential witnesses confirm that construction began in about May 2015, and was ongoing through at least November. (*Id.*).

Specifically, a confidential witness designated "CW-1" in the Consolidated Third Amended Complaint stated that construction on the first floor of the Culver City facility was ongoing throughout CW-1's employment, starting in April 2015 through November 2015. (CTAC ¶ 64). CW-1 heard that the first floor was to be used for laboratory space. Similarly, a confidential witness designated "CW-2," who worked at the Culver City facility from August 2014 through August 2015, stated that construction at the facility was "constant" and was intended to convert the facility to laboratory space. (*Id.*). However, although NantKwest's November 12, 2015 Form 10-Q stated that a lease agreement with NantWorks was "effective as of May 22, 2015," neither the fact of the related-party lease arrangement nor the millions of dollars in liability incurred as a result of the modifications to the facility were disclosed at the time of the IPO. (*Id.* ¶ 65). Additionally, in June 2015, NantKwest entered into related-party agreements with three other NantWorks entities: NantOmics, NantCell, and NantCav. (*Id.* ¶ 66).

On June 19, 2015, NantKwest filed an initial registration statement with the SEC on Form S-1. (CTAC ¶ 6). The final Registration Statement was filed on June 16, 2015. (*Id.* ¶ 7; Reg. Stmt. at 4). Copies of the Soon-Shiong Employment Agreement and the amended Warrant were attached to the Registration Statement. As explained above, although the Warrant that was attached to the Registration Statement was dated March 24, 2015, the Warrant's terms reflected the May 2015 modifications. (*See* Warrant at 542).

The Registration Statement also included the following representations:

> Dr. Soon-Shiong's employment agreement provides that, in consideration of Dr. Soon-Shiong's appointment as Chief Executive Officer, on March 24, 2015, we granted or will grant to Dr. Soon-Shiong the following equity awards:
>
> . . .

> A warrant to purchase up to 17,589,250 shares of the Company's common stock at an exercise price of $2.00 was issued to Dr. Soon-Shiong on March 24, 2015. The warrant ***will vest*** as follows: . . . (ii) up to 10,183,250 shares will vest based upon achievement of certain strategic, manufacturing, clinical development and regulatory milestones.

(CTAC ¶ 84) (emphasis added); and

> [T]he options, warrant, and restricted stock units to purchase or receive common stock held by our Chairman and Chief Executive Officer ***may*** entitle him to acquire up to an aggregate of 20.9 million shares of our common stock (including equity awards for 1.5 million shares that will be granted and begin vesting effective upon the closing of this offering).

(CTAC ¶ 86) (emphasis added).

Contrary to the Registration Statement, it was already probable due to Soon-Shiong's relationship with Celgene that 8.3 million warrant shares would vest, meaning that as early as May 2015 NantKwest had already effectively incurred a very large executive compensation expense. (*Id.* ¶ 87; *see also* 17 C.F.R. § 210.4-01(a)(1) (requiring that financial statements filed with the Securities Exchange Commission ("SEC") be "prepared in accordance with generally accepted accounting principles" and providing that statements not so prepared "will be presumed to be misleading or inaccurate"); CTAC ¶ 59 (discussing Accounting Standards Codification ("ASC") 718-10-25-20, requiring that "[a]ccruals of compensation cost for an award with a performance condition shall be based on the probable outcome of that performance condition — compensation cost shall be accrued if it is probable that the performance condition will be achieved").

The Registration Statement additionally described NantKwest as having "certain operations in Culver City, California," without explaining that in May 2015 NantKwest had entered into a related party lease arrangement with other Soon-Shiong entities, construction on the facilities had already begun, and NantKwest had already incurred millions of dollars in liability to make the structural changes needed to transform the

space for laboratory use. (CTAC ¶ 90). Indeed, despite the statement regarding "operations in Culver City, California," the Registration Statement did not list the Culver City facility along with the company's other facilities in the Registration Statement. (*Id.* ¶ 91; *see also id.* ¶¶ 76–82 (discussing Generally Accepted Accounting Principles ("GAAP") that financial statements disclose related party transactions)).

Although the "Subsequent Events" section of the Registration Statement represented that NantKwest "evaluated subsequent events through May 14, 2015" and "updated its evaluation of subsequent events through July 15, 2015," the Registration Statement was not updated to reflect the foregoing information. (CTAC ¶ 93). Rather, the Registration Statement represented that there were "***no additional significant events***" requiring disclosure. (*Id.*) (emphasis in original). Finally, although the Registration Statement represented that the financial statements contained therein were "prepared in accordance with accounting principles generally accepted in the united States," as discussed above the failure to disclose the probable vesting of Soon-Shiong's warrants and the related party lease in Culver City violated GAAP and ASC requirements, as discussed above. (*Id.* ¶ 95).

On July 28, 2015, in its Initial Public Offering ("IPO"), NantKwest sold 9,531,200 shares of common stock at $25 per share. (CTAC ¶ 7). NantKwest raised more than $225 million in its IPO. (*Id.* at ¶ 98).

**Events Following the NantKwest IPO**

Following the IPO, Defendants began a series of partial disclosures of the information concealed in the Registration Statement.

On September 9, 2015, after the market closed, NantKwest filed its Second Quarter Form 10-Q report for the period ending June 30, 2015 (the "2Q Form 10-Q"). (CTAC ¶ 102). Soon-Shiong signed the 2Q Form 10-Q. (*Id.*). The 2Q Form 10-Q stated that in the second quarter of 2015, it incurred $71.2 million in executive compensation expense "due to a performance milestone being achieved which triggered the vesting of 8,331,750 warrant shares for our Chief Executive Officer," *i.e.* Soon-Shiong. (*Id.*). Of course, this was not the whole truth; as described above, the

actual compensation expense associated with the vesting of Soon-Shiong's warrants was more than $100 million. (*Id.* ¶ 103). And NantKwest again failed to disclose the existence of the related party lease at the Culver City facility. (*Id.* ¶ 105).

On November 12, 2015, NantKwest filed its Third Quarter Form 10-Q report for the period ending September 30, 2015 (the "3Q Form 10-Q"). (CTAC ¶ 108). The 3Q Form 10-Q was also signed by Soon-Shiong. (*Id.*). Like the 2Q Form 10-Q, the 3Q Form 10-Q understated NantKwest's stock-based compensation expenses, and failed to account for the structural improvements to the Culver City facility. (*Id.*).

On November 27, 2015, before the market opened, NantKwest disclosed that two of its Directors, Defendants Ji and Rosen, would resign at the end of the year. (CTAC ¶ 119). "The partial disclosure was unexpected by investors and signaled governance and compensation problems, in particular because Ji was a long-time partner of Soon- Shiong's and Rosen served on the Compensation Committee of NantKwest's Board." (*Id.*). That day, NantKwest shares closed at $16.30, a decline of $0.32 from the prior day's close of $16.62. (*Id.*).

On January 25, 2016, after the market closed, NantKwest announced that Angela Wilson, the Chief Financial Officer it had hired less than three months earlier, had resigned on January 19, 2016. (CTAC ¶ 120). Wilson resigned before she would have had to certify NantKwest's year-end financial statements. (*Id.*). "Thus, Wilson's prompt and unexpected resignation suggested that she did not want to sign NantKwest's upcoming Form 10-K or certify its financial statements pursuant to the Sarbanes-Oxley Act of 2002, signaling problems to investors." (*Id.*). The following day, NantKwest shares closed at $11.99, down $0.25 from the prior day's close of $12.24. (*Id.*).

On March 11, 2016, before the market opened, NantKwest warned that the financial results reported in the Second and Third Quarter Forms 10-Q should no longer be relied upon "due to the combined effect of financial statement errors primarily attributable to certain stock-based awards to the Company's Chief Executive Officer and Executive Chairman [Soon-Shiong] and build-to-suit lease accounting related to one of its research and development . . . facilities." (Statement of

Unreliability at 379). NantKwest announced that it intended to include restated financial statements for those two quarters as part of the Company's soon-to-be-filed Form 10-K annual report. (CTAC ¶ 121). NantKwest shares closed at $8.17 that day, down $0.28 from the prior day's close of $8.45. (*Id.*).

On March 30, 2016, NantKwest filed its FY 2015 Form 10-K with the SEC for the period covering the 2015 fiscal year. (CTAC ¶ 122). The 2015 Form 10-K disclosed that, as a result of the May 2015 Warrant modification, NantKwest "recorded incremental stock compensation expense of $43.4 million associated with the achievement of a performance milestone in the second quarter of 2015". (FY 2015 Form 10-K at 523). Additionally, the FY 2015 Form 10-K explained, NantKwest "recognized additional compensation expense of $2.9 million for the second and third quarters of 2015, respectively, for the shares with service vesting requirements." (*Id.*).

The FY 2015 Form 10-K also disclosed that, "[i]n November 2015, [NantKwest] entered into a facility license agreement with NantWorks for approximately 9,500 square feet of office space in Culver City, California, which is to be converted to a research and development laboratory and a Good Manufacturing Practices (GMP) laboratory." (CTAC ¶ 123). The FY 2015 Form 10-K explained that "[t]he license was effective in May 2015 and extends through December 2020" and that "[NantKwest] is responsible for costs to build out the laboratory and has incurred costs of approximately $2.0 million as of December 31, 2015 . . . ." (*Id.*). Because NantKwest made structural changes to the building, NantKwest determined that it was "deemed owner" of the building for the duration of the construction period. (*Id.*). Accordingly, NantKwest recorded build-to-suit lease liability of $2.7 million. (*Id.*).

The day the FY 2015 Form 10-K was released, NantKwest shares closed at $8.21, a decline of $0.29 from the prior day's close of $8.50. (CTAC ¶ 127).

Although NantKwest's stock has fallen 74% since the IPO, Soon-Shiong received the highest compensation of all executives tracked by Bloomberg in 2015 — by more than $150 million. (CTAC ¶ 16). Plaintiffs point out that Soon-Shiong was compensated more highly than the CEOs of the largest and most successful tech

companies in 2015, including the CEOs of Google, Palo Alto Networks, and Tesla. (*Id.*).

**Allegations Regarding Scienter**

Plaintiffs allege the following conduct indicated that Defendants either recklessly or intentionally made the relevant misrepresentations described above:

- Soon-Shiong, Simon, and NantKwest had actual knowledge of the terms of Soon-Shiong's modified performance-based warrant milestones because each negotiated and consented to the May 8, 2015 modifications;

- NantKwest and each of the Individual Defendants had actual knowledge that the conditions necessary to trigger the largest performance-based milestone in Soon-Shiong's modified warrant agreement were probable as of the May 8, 2015 grant date because each knew of Celgene's history of investment in Soon-Shiong entities, Soon-Shiong's position as the largest individual shareholder of Celgene, and that in June 2015, Celgene, a "strategic partner" had made a significant investment in NantKwest's private placement, and each signed a Registration Statement on July 16, 2015, expressly describing Celgene as an "existing stockholder";

- Soon-Shiong was aware of Celgene's June 2015 investment and planned additional investment concurrent with the IPO because he was the architect of the deal with Celgene, the largest individual shareholder in Celgene, and had arranged several other strategic deals in the preceding years between Celgene and his other entities, including NantHealth, NantBiosciences, and the CSS Institute;

- Rosen, Potts, and Kusserow had actual knowledge of the modifications of warrant milestones because they were on the Compensation Committee of the Board of Directors at the time, and would have had to approve the

modifications to Soon-Shiong's warrant (if not approved by the entire Board);

- NantKwest and all of the individual Defendants had actual knowledge that warrant expenses were material to financial results and that failure to properly account for warrants could overstate results by tens of millions of dollars. For example, on July 2, 2015, less than two weeks before the IPO, the Individual Defendants each signed a Form S-1/A restating the financial statements filed weeks earlier in the initial Form S-1 due to understatement by more than $22 million of expenses related to warrants issued in the Inex Bio acquisition; and

- Gomberg holds himself out on his LinkedIn profile as an expert in "SEC Reporting" and "stock compensation."

- NantKwest and Soon-Shiong had actual knowledge of the Culver City lease arrangement because the arrangement was between NantKwest and NantWorks and pertained to the office building out of which most of Soon-Shiong's businesses operated;

- NantKwest and Soon-Shiong had actual knowledge that the office space was being modified beginning in May 2015 to laboratory space for NantKwest's purposes, because NantKwest specified the modifications it needed and because Soon-Shiong caused his umbrella company, NantWorks, to agree to those modifications;

- Because Soon-Shiong's office was in the same building undergoing structural modifications, Soon-Shiong would have both seen and heard those modifications in the course of daily activities; and

- Blaszyk, Kusserow, and Thomas had actual knowledge of the related party lease arrangement and associated liabilities because, as audit committee

> members, they were charged by NantKwest's Audit Committee Charter with reviewing and approving related party transactions.

(CTAC ¶¶ 110–11). Plaintiffs further allege that Soon-Shiong has a history of using his network of companies and non-profit organizations to disguise self-dealing and other suspicious transactions, boosting an inference of scienter. (*Id.* ¶¶ 112–17).

**Procedural History**

On March 22, 2016, before NantKwest filed its 2015 10-K, Plaintiff Sunil Sudunagunta filed a complaint alleging violations of §§ 10(b) and 20(a) of Exchange Act from September 10, 2015 through March 10, 2016.

On May 18, 2016, Plaintiff Forsythe also filed a class action securities complaint (the "*Forsythe* Complaint") against NantKwest. (*Forsythe, et al. v. NantKwest, Inc., et al.*, No. CV 16-3438 ("*Forsythe*"), Docket No. 1). The *Forsythe* Complaint alleged an expanded class period starting July 28, 2015, the date of the NantKwest Initial Public Offering ("IPO"). (*Forsythe* Compl. ¶ 1). Like the original complaint filed in this action, the *Forsythe* Complaint only alleged violations of the Exchange Act. (*Id.*).

On June 14, 2016, the related cases were consolidated and Donald Hu and Brayton Li were appointed Lead Plaintiffs. (Docket No. 34). On August 4, 2016, Lead Plaintiffs filed their Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws. (Docket No. 49). The Consolidated Complaint added new claims under §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o, and expanded the class period to include NantKwest's IPO on July 28, 2015. (Consol. Compl. ¶ 1). The Complaint also alleges that Soon-Shiong and Gomberg are liable as "controlling persons" of NantKwest. (*Id.* ¶¶ 125, 145).

On October 11, 2016, the Court consolidated the action with several more related cases, which had been recently removed from state court. (Docket No. 76). On February 6, 2017, the Court denied the removed plaintiffs' motion for republication. (Docket No. 93).

On May 16, 2017, the Court issued an Order granting in part and denying in part Defendants' first joint motion to dismiss the Consolidated Complaint (the "May Order"). (Docket No. 108). Plaintiffs filed a Consolidated Second Amended Class Action Complaint on June 5, 2017 (Docket No. 109), and on July 10, 2017, Plaintiffs filed the operative Consolidated Third Amended Class Action Complaint (Docket No. 112), pursuant to the stipulation of the parties.

## II. DISCUSSION

### A. Pleading Standards

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013)

In ruling on the Motion under Rule 12(b)(6), the Court follows *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The Court must disregard allegations that are legal conclusions, even when disguised as facts. *See id*. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Eclectic Properties E., LLC v. Marcus & Millichap Co*., 751 F.3d 990, 996 (9th Cir. 2014). "Although 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof is improbable,' plaintiffs must include sufficient 'factual enhancement' to cross 'the line between possibility and plausibility.'" *Eclectic Properties*, 751 F.3d at 995 (quoting *Twombly*, 550 U.S. at 556–57) (internal citations omitted).

The Court must then determine whether, based on the allegations that remain and all reasonable inferences that may be drawn therefrom, the Complaint alleges a plausible claim for relief. *See Iqbal*, 556 U.S. at 679; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011). "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, No. 13-56644, 2016 WL 5389307, at *2 (9th Cir. Sept. 27, 2016) (as amended) (quoting *Iqbal*, 556 U.S. at 679). Where the facts as pleaded in the Complaint indicate that there are two alternative explanations, only one of which would result in liability, "plaintiffs cannot offer allegations that are merely consistent with their favored explanation but are also consistent with the alternative explanation. Something more is needed, such as facts tending to exclude the possibility that the alternative explanation is true, in order to render plaintiffs' allegations plausible." *Eclectic Properties*, 751 F.3d at 996–97; *see also Somers*, 729 F.3d at 960.

Allegations of fraud must meet a higher pleading standard. Fed. R. Civ. P. 9(b) (requiring the pleading party to "state with particularity the circumstances constituting fraud or mistake"). It is well-established that, "[a]t the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ('PSLRA')." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). The parties do not dispute the standard for pleading Plaintiffs' Exchange Act claims.

The particularity requirements of Rule 9(b) also apply to § 11 claims where the claims are "grounded in fraud." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996). Defendants contend that is the case here. (Mot. at 5–6). Plaintiffs claim they have disclaimed any allegations of fraud as a basis for § 11 liability. (Opp. at 9 n.5). The Court declines to determine which set of pleading standards apply, because even under the heightened pleading standards of Rule 9(b), Plaintiffs' allegations are sufficient.

### B. <u>The Securities Act Claims</u>

"The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Norfolk Cty.*, 2016 WL 7475555, at *3

(quoting *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994)). Plaintiffs need not allege scienter to successfully plead a § 11 claim; "defendants will be liable for innocent or negligent material misstatements or omissions." *Id.* (quoting *Kaplan*, 49 F.3d at 1371); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) ("Liability against the issuer of a security is virtually absolute, even for innocent misstatements.")).

Plaintiffs allege that the registration statement omitted more than $100 million in executive compensation expense related to Soon-Shiong's warrants, and $2.7 million in related party lease liability incurred in connection with construction to renovate the Culver City facility. *See In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1083–84 (N.D. Cal. 2001) ("[T]he mere fact that the statements were restated at all supports . . . an inference" that the original statements were false); *see also Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, No. 16-CV-01820 (JGK), 2017 WL 3261609, at *10 (S.D.N.Y. July 28, 2017) (slip op.) ("Under GAAP, previously issued financial statements should be restated only to correct material accounting errors that existed at the time the statements were originally issued.") (internal quotations omitted); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486–87 (S.D.N.Y. 2004) ("Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made."); *S.E.C. v. Espuelas*, 908 F. Supp. 2d 402, 410 (S.D.N.Y. 2012) (same).

The question is whether Defendants were required to disclose the omitted information, that is, whether the omitted information was material.

**1. Executive Compensation**

Defendants respond that the executive compensation expenses were disclosed adequately in the Registration Statement. At the hearing, Defendants argued that the following five disclosures concerning compensation expenses were sufficient under federal law: (1) the registration statement attached Soon-Shiong's actual warrant agreement; (2) the registration statement included Soon-Shiong's employment

agreement, which disclosed the number of shares he might acquire and the vesting price; (3) the registration statement disclosed the vesting terms with respect to all warrant shares; (4) the prospectus disclosed that an affiliate of Celgene, an existing stockholder of NantKwest, had agreed to purchase $17 million of NantKwest's common stock; and (5) the prospectus disclosed that 9 million shares "may be acquired pursuant to the exercise of warrants held of record within 60 days of July 10, 2015 by Dr. Soon-Shiong." (*See also* Mot. at 9–10).

But Defendants point to no Ninth Circuit authority establishing that such disclosures are sufficient to warrant dismissal of this § 11 claim. Moreover, a warning that more than 9 million shares "***may be acquired*** pursuant to the exercise of warrants held of record within 60 days of July 10, 2015, by Dr. Soon-Shiong." (Mot. at 9–10) (emphasis added) is not necessarily sufficient given that, under the terms of the agreement with Celgene, the shares were ***guaranteed*** to vest at the time of the IPO. Stating obliquely that the shares "may be acquired" was not necessarily sufficient given the state of the financials at the time.

Defendants next renew their contention from the briefing on the previous motion to dismiss that because the expenses were incurred in the second quarter of the 2015 fiscal year, Defendants were not obligated to report the expenses under the SEC rules. (Mot. at 10–13). As the Court previously explained, under the relevant SEC regulations, the most recent financial statement filed in support of a Registration Statement cannot be more than 135 days old. *See* 17 C.F.R. § 210.3–12(a) ("Regulation S-X") (requiring interim financial reports be included in the registration statement when the financial reports were "as of a date 135 days or more prior to the date the [registration statement] is expected to become effective."); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 513 (S.D.N.Y. 2013) ("[T]he SEC does not require disclosure of revenue data from a quarter that is completed up to a month and a half before an IPO . . . ."). Here, assuming the Registration Statement did not become effective until the day of the IPO, July 28, 2015, the second quarter financial statements were "as of" April 1, 2015 and thus less than 135 days prior to July 28, 2015.

However, Regulation S-X is not dispositive. "The SEC's general regulations expressly provide that '[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.'" *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (quoting 17 C.F.R. § 230.408). Accordingly, the Court must make a holistic inquiry as to "whether there is 'a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

As the Court previously held, a reasonable investor would have viewed the vesting of $114.6 million in executive compensation during the second quarter as material. (*See* May Order at 12–13). As alleged in the Consolidated Third Amended Complaint, the undisclosed compensation — which the parties knew was likely to vest as early as May 8, 2015 — was nearly one thousand times more than the total amount of revenues NantKwest recorded in the first quarter of 2015, and nearly four times NantKwest's total ***losses*** and two hundred times NantKwest's research and development expenses for that quarter. (CTAC ¶ 9).

At the hearing, Defendants suggested that Soon-Shiong earned this compensation because he more than doubled the value of the company within three months of becoming CEO. Whether Soon-Shiong deserved the compensation or not is irrelevant to the question of whether the executive compensation should have been disclosed as a matter of law. Plaintiffs have alleged with sufficient specificity that a reasonable investor would have seriously reconsidered the "total mix" of information available had the full details of Soon-Shiong's executive compensation been revealed.

Accordingly, the Motion is **DENIED** as to this claim.

### 2. Related-Party Lease Liability

The Court previously determined that Plaintiffs had not pled sufficient facts to support a claim of misrepresentation based on the related-party lease liability. (May

Order at 13–14). Previously, the only evidence of the related party lease was the statement in the FY 2015 Form 10-K that NantKwest "entered into a facility license agreement with NantWorks" in November 2015, "effective in May 2015 . . . ." (*Id.* at 14). The Court determined that Plaintiffs failed to explain "why, despite the plain language of the FY 2015 Form 10-K, Plaintiffs believe the parties actually entered into the lease agreement in May 2015." (*Id.*).

The Consolidated Third Amended Complaint includes additional allegations that address the Court's concerns. First, Plaintiffs have added detailed allegations, based on the statements of confidential witnesses, that construction on the facility began in April or May 2015. Combined with the statements in the FY 2015 Form 10-K that the leased property required extensive construction to convert it into a laboratory, Plaintiffs have plausibly and specifically alleged a theory that NantKwest and NantWorks ***actually***, and not just ***effectively***, entered into the lease agreement in about May 2015. In other words, based on the allegations and NantKwest's SEC filings, the trier of fact could conclude that the spring construction at the Culver City facility was a result of the related-party lease — not an entirely unrelated occurrence that just so happened to predate a November related party lease that called for construction to renovate the facility into a lab. NantKwest's failure to include the lease in the Registration Statement is potentially a material omission.

Accordingly, the Motion is **DENIED** as to the claims regarding the related-party lease.

### 3. Subsequent Events

Plaintiffs' claims that information regarding the changes to executive compensation and related-lease liability should have been included in the Subsequent Events section of the Registration Statement are essentially duplicative of the previously-discussed claims, and thus rise and fall with the previous theories of liability. Because the Court has denied the Motion as to the other claims, the Motion is also **DENIED** as to the claims for liability based on the Subsequent Events section of the Registration Statement.

### C. The Exchange Act Claims

"To sufficiently plead a primary violation of Rule 10b–5 based on misstatements, a plaintiff must adequately allege the following: 1) a material misrepresentation or omission by the defendant; 2) scienter; 3) a connection between the misrepresentation or omission and the purchase or sale of a security; 4) reliance upon the misrepresentation or omission; 5) economic loss; and 6) loss causation." *In re Rigel*, 697 F.3d at 876 (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). "The PSLRA imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." *Id.* Here, Plaintiffs' § 10 claims primarily are premised on the same material misrepresentations as their claims under § 11.

To allege falsity under the PSLRA, a complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u–4. To allege scienter under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(a). "Courts have described the required state of mind as one that intends to deceive, manipulate, or defraud." *Hsu v. Puma Biotechnology, Inc.*, No. SACV150865AGJCGX, 2016 WL 5859000, at *8 (C.D. Cal. Sept. 30, 2016) (slip op) (citing *Metzler*, 540 F.3d at 1070).

However, "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (2004)). The Court should deny a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged" in the complaint. *Id.* at 324.

**1. Executive Compensation**

As for Soon-Shiong, it is hard to believe other than that he knew the details of his compensation package, and furthermore knew that it was virtually certain to vest at the time of the IPO. As pled in the Consolidated Third Amended Complaint, Soon-Shiong is a sophisticated businessman with extensive experience buying and selling stock, managing business entities, and navigating financial disclosure requirements. Moreover, Celgene's two large investments, totaling $25 million, were made within weeks of the modification to Soon-Shiong's compensation agreement. And, as the Consolidated Third Amended Complaint emphasizes, Celgene has a long history of investing in Soon-Shiong's projects, and Soon-Shiong is its largest individual investor. Plaintiffs have pled facts raising a strong inference that Soon-Shiong knew, as early as May 8, 2015, that he would meet his performance milestone — and likely began negotiations for the investments in advance of the warrant modification.

Plaintiffs also sufficiently plead scienter with respect to the remaining individual Defendants. Gomberg was the Chief Financial Officer at NantKwest at the time of the IPO, and according to the Registration Statement exercised "almost complete responsibility for the processing of financial information." (CTAC ¶ 149). Gomberg claims, on his LinkedIn profile, to have "[l]ed the S-1 drafting and due diligence activities" at NantKwest. (*Id.*). The allegations are sufficient to show that Gomberg had actual knowledge of the warrant modification and the Registration Statement.

Finally, Defendants Kusserow, Blaszyk, and Thomas were all members of the Audit Committee. (*Id.* ¶¶ 29, 31, 34). While "[g]eneral allegations concerning an outside director's position in a company and/or his committee memberships are insufficient, on their own, to give rise to a strong inference of scienter" they may be enough "when combined with allegations of particular activities suggesting access to and knowledge of information concerning the specific fraud at issue." *Brown v. China Integrated Energy, Inc.*, No. CV112559MMMPLAX, 2013 WL 12124124, at *7 (C.D. Cal. Apr. 22, 2013) (citing *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d at 1063). Here, Plaintiffs allege that the Audit Committee was charged with reviewing the financial disclosures in the Registration Statement and quarterly reports, as well as

for the terms of the modification warrant. (CTAC ¶¶ 60, 111). Accordingly, it is reasonable to infer that they, too, were aware of the misrepresentations at issue.

From the foregoing, Plaintiffs have sufficiently alleged facts giving rise to a strong inference is that Soon-Shiong and the remaining individual Defendants knew that the enormous amount of his executive compensation would make investors think twice about participating in the IPO — and thus structured his compensation to avoid tipping investors off to its size, while still maintaining some level of plausible deniability once the true nature of the compensation package was revealed.

Accordingly, the Motion is **DENIED** as to these claims.

**2. Related Party Lease Liability**

For similar reasons, the Court concludes that Plaintiffs have adequately alleged scienter regarding the claims premised on misrepresentation of NantKwest's related party lease liability. The Court previously concluded, *supra*, that the Consolidate4d Third Amended Complaint supports an inference that NantKwest actually entered into the lease in about May 2015. Given Soon-Shiong's personal involvement in both NantWorks and NantKwest, and the fact that his offices were also located at the Culver City facility, Plaintiffs have raised a very strong inference that Soon-Shiong himself was aware of, and "negotiated" so to speak, the related party lease. Plaintiffs have sufficiently pled his actual knowledge of the misrepresentation at issue.

As for members of NantKwest's Audit Committee, they too more likely than not had actual knowledge of the lease, because they were charged with reviewing and approving the lease. (CTAC ¶ 111). They thus must have been aware of ***when*** the entities entered into the lease.

Defendants contend, as to both of the foregoing theories, that the absence of any indication of insider trading negates the inference of scienter. But insider trading is not required to establish scienter, *see In re Daou Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("the PSLRA neither prohibits nor endorses the pleading of insider trading as evidence of scienter, but requires that the evidence meet the 'strong inference'

standard.”). Here, Plaintiffs have pled that Soon-Shiong enjoyed significant personal benefits as a result of the failure to disclose the warrant modifications or the related party lease. *See also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1044 (N.D. Cal. 2016) (“Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.”) (quoting *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003)); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1076 (E.D. Wash. 2016) (concluding that defendants’ failure to profit from stock sales did not negate inference of scienter). Indeed, all of the Defendants profited from an IPO that likely would not have been nearly so successful if potential investors had known the full extent of NantKwest’s executive compensation and significant lease liability.

“[T]he total of plaintiffs’ allegations . . . are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness.” *In re Daou*, 411 F.3d at 1022. Accordingly, as to these Defendants, the Motion is **DENIED.**

## III. CONCLUSION

For the foregoing reasons, the Motion is **DENIED.** Defendants’ Answers shall be filed on or before **October 2, 2017.**

IT IS SO ORDERED.