Robert V. Prongay (SBN 270796)
Kara M. Wolke (SBN 241521)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: kwolke@glancylaw.com

Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6449
E-mail: jpafiti@pomlaw.com

[Additional Counsel on Signature Page]
*Attorneys for Lead Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SUNIL SUDUNAGUNTA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NANTKWEST, INC., PATRICK SOON-SHIONG, RICHARD GOMBERG, BARRY J. SIMON, STEVE GORLIN, MICHAEL D. BLASZYK, HENRY JI, RICHARD KUSSEROW, JOHN T. POTTS, JR., ROBERT ROSEN, JOHN C. THOMAS JR., MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., CITIGROUP GLOBAL MARKETS INC., JEFFERIES LLC, PIPER JAFFRAY & CO., and MLV & CO., LLC.,<br><br>Defendants. | No. 2:16-cv-01947-MWF-JEM<br><br>**<u>CLASS ACTION</u>**<br><br>Hon. Michael W. Fitzgerald<br><br>**CONSOLIDATED FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

# TABLE OF CONTENTS


NATURE OF THE ACTION ........ 1

JURISDICTION AND VENUE ........ 8

PARTIES ........ 9

SUBSTANTIVE ALLEGATIONS ........ 13

- Soon-Shiong's Deep Relationship with Celgene ........ 13
- Soon-Shiong Takes Over Conkwest, Rebrands As NantKwest Right Before IPO ........ 15
- SEC Rules And GAAP Mandated Disclosure Of The Warrant Expense And Related-Party Lease ........ 24
- Defendants Use Material Misstatements And Omissions In The Registration Statement To Sell NantKwest Shares To Public Investors ........ 27

PLAINTIFFS' CLASS ACTION ALLEGATIONS ........ 33

COUNT I ........ 35

COUNT II ........ 36

DEMAND FOR TRIAL BY JURY ........ 38

Lead Plaintiffs Donald Hu and Brayton Li ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by, and regarding, NantKwest, Inc. ("NantKwest" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1. This is a class action arising out of Defendants' misrepresentations and omissions related to a secret warrant modification that elevated Defendant Patrick Soon-Shiong's ("Soon-Shiong") compensation higher than any other executive in the United States, and a secret related-party lease arrangement NantKwest and Soon-Shiong made prior to NantKwest's initial public offering ("IPO"), causing NantKwest to incur millions of dollars of unreported liability. Plaintiffs bring this case on behalf of themselves and all other persons or entities who purchased or otherwise acquired NantKwest common stock pursuant and/or traceable to NantKwest's Registration Statement issued in connection with its July 28, 2015 IPO, seeking to pursue remedies under §§ 11 and 15 of the Securities Act of 1933 ("Securities Act").

2. Defendant NantKwest has operated as a development-stage immunotherapy company since at least 2007, when it was known as Conkwest, Inc. ("Conkwest"). Like several other cancer immunotherapy companies, NantKwest focuses on attempting to harness "natural killer" cells generated by the human immune system to treat cancer, infectious diseases, and inflammatory diseases. According to the Company, natural killer cells are "the body's first line of defense due to their innate ability to rapidly seek and destroy abnormal cells, such as cancer or virally-infected cells, without prior exposure or activation by other support molecules required to activate adaptive immune cells such as T-cells." *See* Form S-1/A filed with the SEC on July 16, 2015 at 1.[1]

3. Defendant Soon-Shiong is the Chief Executive Officer ("CEO") and Chairman of the Board of Directors of NantKwest (the "Board"). In 2011, Soon-Shiong formed NantWorks LLC ("NantWorks") and a series of subsidiary companies operating in various areas of pharmaceutical development and healthcare-related information technology.

4. At the end of 2014 and early 2015, Soon-Shiong undertook a series of transactions to gain control of NantKwest (then Conkwest), and to enmesh it within his web of related-party companies. Specifically:

(a) In December 2014, NantKwest agreed to jointly develop therapies with Sorrento Therapeutics, Inc. ("Sorrento"), a company in which Soon-

---

[1] The Form S-1/A filed on July 16, 2015 is identified as Amendment No. 4 to NantKwest's registration statement, and is the last full version of the registration statement filed with the SEC before NantKwest's IPO. As used herein, the capitalized term "Registration Statement" refers to the July 16, 2015 S-1/A as subsequently modified by the partial amendments filed on July 27, 2015.

Shiong was the largest shareholder and his affiliate, Defendant Henry Ji ("Ji"), was CEO and President.

(b) On December 16 and 18, 2014, Soon-Shiong caused Sorrento to purchase 4,557,537 shares of NantKwest Class A common stock pursuant to a subscription and investment agreement at $1.76 per share.[2] The Sorrento agreement allowed Sorrento to designate a Director to serve on NantKwest's Board of Directors, so long as Sorrento retained at least 462,875 shares (slightly more than 10% of its initial purchase).

(c) On December 23, 2014, Sorrento purchased an additional 1,060,789 shares of NantKwest Class A common stock at $1.89 per share.

(d) On December 23, 2014, Soon-Shiong caused Cambridge Equities, LP ("Cambridge"), an investment vehicle he owns and controls, to purchase 25,191,473 shares of NantKwest Class A common stock at $1.89 per share.

(e) As a result of these transactions, in December 2014, Soon-Shiong was named Co-Chairman of NantKwest's Board and Ji was named a Director.

(f) In January 2015, Soon-Shiong was named Chief Medical Officer of NantKwest.

---

[2] In June 2015, the Class A shares were recapitalized, on a 1:1 basis, into unclassified common stock. On July 10, 2015, prior to the IPO, the unclassified common stock was split 1.8515:1. Except where noted, all prices referenced in this Complaint are reported on a split-adjusted basis.

(g) Only two months later, in March 2015, Soon-Shiong was promoted to CEO of NantKwest. He also became the sole Chairman of NantKwest's Board at that time.

(h) On March 24, 2015, NantKwest granted Soon-Shiong a warrant to purchase millions of shares of the Company's stock and options to purchase additional shares following the IPO and at other times.

(i) On March 25, 2015, Soon-Shiong entered into an employment agreement with NantKwest, which was subsequently amended prior to the IPO.

(j) On March 30, 2015, NantKwest exchanged $6.5 million in cash and millions of warrants for Inex Bio, Inc., a pharmaceutical company jointly owned by Soon-Shiong and Defendant Ji through a holding company. As a result of exercising the warrant, Soon-Shiong and Ji gained beneficial ownership over an additional 2,609,520 shares of NantKwest Class A common stock.

(k) To provide additional compensation to Soon-Shiong, on May 8, 2015, Soon-Shiong and NantKwest amended Soon-Shiong's warrant agreement by "mutual agreement." While the amended terms were set forth in the Warrant Agreement attached to NantKwest's Registration Statement, the Warrant Agreement itself was backdated to March 24, 2015. The modified terms provided that 7,406,000 shares would vest over a period of 40 months, and up to 10,183,250 shares would vest based upon achievement of so-called "performance milestones." Critically, the May 8, 2015 modifications stacked the deck to ensure payouts to Soon-Shiong, by specifying the conditions for the largest "performance milestone" to be so easily achievable that it was ***already probable***.

(l) The largest "performance milestone" called for Soon-Shiong to be awarded 8,331,750 shares (4,500,000 pre-split) upon a $20 million or greater investment by a large, multinational pharmaceutical or biotech company. This was not a "performance milestone" at all, but rather a near certainty. Soon-Shiong was the largest individual investor in Celgene Corporation ("Celgene"), a global biotech giant, and Celgene routinely invested greater sums in Soon-Shiong's ventures.

(m) As planned and anticipated, on or shortly after June 10, 2015, Soon-Shiong caused a stock subscription agreement to be entered into with an investment subsidiary of Celgene, as well as other purchasers.

(n) In June 2015, NantKwest named a Soon-Shiong affiliate, NantOmics LLC, as its provider of genomic sequencing and proteomic analysis services, as well as related data management and bioinformatics services.

(o) In June 2015, NantKwest licensed technologies from another Soon-Shiong affiliate, NanoCav LLC.

(p) In June 2015, NantKwest also entered into a supply agreement with another Soon-Shiong affiliate, NantCell LLC.

(q) On June 18, 2015, the Company granted Cambridge the right to nominate a Director to NantKwest's Board.

5. In May 2015, Soon-Shiong consolidated the physical base for his business empire. Space was converted for laboratory use so that NantKwest could join other Soon-Shiong entities in the multi-million dollar facility owned by NantWorks, located at 9920 Jefferson Boulevard, Culver City, California, 90232. As Defendants would later admit, NantKwest incurred $2.7 million in liability

during the second quarter of 2015 as a result of structural changes to transform the leased space to the laboratory configuration required by NantKwest.

6. On June 19, 2015, the Company filed a registration statement with the SEC on Form S-1. By the time of a July 13, 2015 amendment on Form S-1/A, the Company had officially changed its name from Conkwest to NantKwest to align branding with Soon-Shiong's other companies.

7. On July 16, 2015, as subsequently amended, NantKwest filed with the SEC its final full Registration Statement. Pursuant to this Registration Statement, on July 28, 2015, the Company sold 9,531,200 shares of common stock in its IPO at $25 per share for proceeds of approximately $225,486,000 after underwriters' discounts and commissions, but before offering expenses of approximately $3,000,000. Additionally, according to the Registration Statement, an affiliate of Celgene purchased $17 million worth of common stock in another private placement concurrent with the IPO. The Registration Statement mentioned for the first time that Celgene was an "existing stockholder" but did not identify the date or amount of its purchases, or acknowledge that Celgene's purchases had been planned and anticipated at the time of the May 8, 2015 warrant modification, and had been designated a "milestone" at that time to create a windfall payout to Soon-Shiong.

8. The Registration Statement that Defendants used to sell shares in NantKwest's IPO was materially false and misleading in three important respects: (1) it failed to disclose that NantKwest had funneled more than $100 million in additional compensation to Soon-Shiong through the modification of warrant terms to include a massive so-called "performance milestone" that was already probable (and, in fact, virtually certain) on May 8, 2015, and NantKwest had already incurred

a similar amount of compensation expense at that time; (2) it failed to disclose that effective May 2015, NantKwest had engaged in a related-party facilities lease arrangement ("Related-Party Lease") with NantWorks, pursuant to which it had already incurred millions of dollars of liability at the time of the IPO; and (3) it understated material weaknesses in the Company's internal controls.

9. These undisclosed expenses dramatically impacted NantKwest's financial condition. The compensation expense already incurred before the IPO but omitted from the Registration Statement totaled approximately $115 million, and the Related-Party Lease liability already incurred before the IPO but omitted from the Registration Statement was $2.7 million. Together, these undisclosed expenses were: (a) nearly ***one thousand times higher*** than the total amount of revenues that NantKwest recorded in the first quarter of 2015, the latest results disclosed in the Registration Statement; (b) nearly ***four times*** NantKwest's total losses for the first quarter of 2015; and (c) nearly ***two hundred times*** NantKwest's research & development expenses for the first quarter of 2015. Because of the magnitude of these expenses, investors could not reasonably understand NantKwest's financial condition without disclosure.

10. Soon-Shiong has not shared the pain felt by NantKwest's shareholders. Despite NantKwest's poor performance, Soon-Shiong received the highest amount of compensation among all executives tracked by Bloomberg in 2015, dwarfing the compensation packages even of CEOs of the largest, most

successful technology companies like Sundar Pichai of Google, Mark McLaughlin of Palo Alto Networks, and Elon Musk of Tesla.[3]




11. With his wealth padded by the exorbitant compensation package awarded to him by NantKwest, Soon-Shiong is widely considered to be one of the richest individuals in Los Angeles, California. *See, e.g.*, "Wealthiest Angelinos: 1, Patrick Soon-Shiong," Los Angeles Business Journal (May 13, 2016).

## JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 22 of the Securities Act (15 U.S.C. § 77v).

---

[3] Max Nisen, "Soon-Shiong's Latest Offering Is Risky," *Bloomberg Gadfly* (June 2, 2016, 2:32 PM CDT), http://www.bloomberg.com/gadfly/articles/2016-06-02/nanthealth-ipo-patrick-soon-shiong-s-risky-bet.

14. Venue is proper in this District pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1391(b), given that a significant portion of the Defendants' actions, and the subsequent damages, took place within this District. The Related-Party Lease involved a property within this District in Culver City, California, and Defendant Soon-Shiong resides in or around Los Angeles, California. According to NantKwest's annual report on Form 10-K, the Company continues to maintain an office at 9920 Jefferson Boulevard, Culver City, California, 90232.

15. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

**PARTIES**

16. Plaintiff Donald Hu, as set forth in his previously-filed Certification (Dkt. No. 25-2), purchased NantKwest securities pursuant and/or traceable to the Company's materially untrue and misleading Registration Statement.

17. Plaintiff Brayton Li, as set forth in his previously-filed Certification (Dkt. No. 25-2), purchased NantKwest securities pursuant and/or traceable to the Company's materially untrue and misleading Registration Statement.

18. Defendant NantKwest is a Delaware corporation formerly known as Conkwest. At the time of its IPO, NantKwest's principal executive offices were located at 533 South Coast Highway 101, Suite 210, Cardiff-by-the-Sea, California 92007. Currently, its principal executive offices are located at 3530 John Hopkins

Court, San Diego, California 92121. NantKwest's shares trade on the NASDAQ national market system under the ticker symbol "NK."

19. Defendant Soon-Shiong is, and was at the time of the IPO, NantKwest's CEO and Chairman of its Board of Directors. Directly and through his various investment vehicles, Soon-Shiong owns the majority of NantKwest shares. According to a Schedule 13D filed with the SEC on July 11, 2016, Soon-Shiong is the beneficial owner of 63.2% of NantKwest shares. According to a Proxy Statement Sorrento filed on May 13, 2016, Soon-Shiong is Sorrento's largest shareholder. He also owns and controls NantWorks, NantHealth, NantOmics, NanoCav, NantCell, and other affiliated companies. Soon-Shiong signed the Registration Statement.

20. Defendant Richard Gomberg ("Gomberg") was the Company's CFO between January 2010 and November 10, 2015. Gomberg signed the Registration Statement.

21. Defendant Barry J. Simon ("Simon") is, and was at the time of the IPO, a Director of NantKwest. Simon has also served as the Company's President and Chief Operating Officer since March 2015. Between 2007 and 2014, Simon served as NantKwest's President and CEO. When NantKwest gained control of Inex Bio, Simon served as a member of Inex Bio's board of directors. Simon signed the Registration Statement.

22. Defendant Steve Gorlin ("Gorlin") is, and was at the time of the IPO, a Director of NantKwest, and the Vice Chairman of the Board of Directors. Gorlin signed the Registration Statement.

23. Defendant Michael D. Blaszyk ("Blaszyk") is, and was at the time of the IPO, a Director of NantKwest. Blaszyk is a member of the Audit and Compensation Committees of the Board of Directors. At the time of the IPO, Blaszyk was a member of the Audit Committee. Blaszyk signed the Registration Statement.

24. Defendant Ji was a Director of NantKwest at the time of the IPO and remained so through his resignation announced on November 27, 2015, which was effective December 31, 2015. Ji had a 50% interest in the holding company that owned the majority of Inex Bio at the time it was acquired by NantKwest. Ji signed the Registration Statement.

25. Defendant Richard Kusserow ("Kusserow") is, and was at the time of the IPO, a Director of NantKwest. Kusserow is, and was at the time of the IPO, a member of the Audit and Compensation Committees of the Board. Kusserow signed the Registration Statement.

26. Defendant John T. Potts, Jr. ("Potts") is, and was at the time of the IPO, a Director of NantKwest. Potts is, and was at the time of the IPO, a member of the Compensation Committee of the Board. Potts signed the Registration Statement.

27. Defendant Robert Rosen ("Rosen") was a Director of NantKwest, and a member of the Compensation Committee, at the time of the IPO. On November 27, 2015, NantKwest announced that Rosen would resign from the Board of Directors effective December 31, 2015. Rosen signed the Registration Statement.

28. Defendant John C. Thomas, Jr. ("Thomas") is, and was at the time of the IPO, a Director of NantKwest. Thomas is, and was at the time of the IPO, a member of the Audit Committee of the Board.

29. Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") was identified in the Registration Statement as an underwriter and a Joint-Book-Running manager of the IPO. Merrill Lynch maintains several offices in this District, including an office at 350 S. Grand Avenue, Los Angeles, CA 90071.

30. Defendant Citigroup Global Markets, Inc. ("Citigroup") was identified in the Registration Statement as an underwriter and a Joint-Book-Running manager of the IPO. Citigroup maintains several offices in this District, including an office at 444 S. Flower Street, Suite 3600, Los Angeles, California 90071.

31. Defendant Jefferies LLC ("Jefferies") was identified in the Registration Statement as an underwriter and a Joint-Book-Running manager of the IPO. Jefferies maintains an office at 11100 Santa Monica Boulevard, Los Angeles, California 90025.

32. Defendant Piper Jaffray & Co. ("Piper Jaffray") was identified in the Registration Statement as an underwriter and a Joint-Book-Running manager of the IPO. Piper Jaffray maintains an office at 444 S. Flower Street, Suite 1675, Los Angeles, California 90071.

33. Defendant MLV & Co., LLC ("MLV") served as an underwriter and Co-Manager of the IPO. MLV has since been acquired by FBR & Co., an investment bank that is headquartered in Arlington, Virginia.

34. Defendants Soon-Shiong, Gomberg, Simon, Gorlin, Blaszyk, Ji, Kusserow, Potts, Rosen, and Thomas are sometimes referred to herein, collectively, as the "Individual Defendants."

35. Defendants Merrill Lynch, Citigroup, Jefferies, Piper Jaffray, and MLV are sometimes referred to herein, collectively, as the "Underwriter Defendants."

36. All of the defendants referenced above are referred to collectively herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Soon-Shiong's Deep Relationship with Celgene

37. Defendant Soon-Shiong is one of the most sophisticated, experienced, and wealthy businessmen in the biopharmaceutical industry. According to Forbes magazine, Soon-Shiong's current net worth is $8.6 billion.[4] As healthcare analyst Raghuram Selvaraju of New York-based MLV emphasized, Soon-Shiong is a shrewd businessman who "never does any deal unless he's 99.9 percent sure he'll get his money back. That's why he's a billionaire."[5]

38. Celgene is one of the world's largest biopharmaceutical companies. Soon-Shiong's deep relationship with Celgene, and the fact that Celgene's two investments took place on the heels of the May 8, 2015 warrant modifications leave no doubt that the investments were probable (if not certain) at the time of the

---

[4] "The World's Billionaires," *Forbes* (Real Time Net Worth As Of July 7, 2017), http://www.forbes.com/profile/patrick-soon-shiong/.

[5] "NantPharma Buys Sorrento Unit For Up to $1.3 Billion," *Los Angeles Business Journal* (May 15, 2015), available at http://labusinessjournal.com/news/2015/may/15/nantpharma-buys-sorrento-unit-13-billion/.

modification. Soon-Shiong's history with Celgene dates back to at least 2010, when Soon-Shiong sold Abraxis Bioscience, Inc. ("Abraxis") to Celgene for $2.9 billion in cash and stock.[6]

39. Since the sale of Abraxis, Soon-Shiong has been the largest individual shareholder in Celgene. Shortly after that sale, in April 2011, Celgene entered into a contribution agreement with Soon-Shiong's charitable foundation, the Chan Soon-Shiong Institute for Advanced Health ("CSS Institute"). Under the contribution agreement, Celgene made an upfront contribution to the CSS Institute valued at $41 million and agreed to make additional contingent and matching contributions up to $75 million in exchange for a right of first refusal for any oncology drugs developed or licensed by the CSS Institute.

40. Later in 2011, Soon-Shiong founded NantWorks, an amalgamation of startups involved in healthcare information technology and pharmaceutical development. Soon-Shiong rapidly formed a series of "Nant"-branded companies under the NantWorks umbrella, including NantBiosciences, NantHealth, NantCell, and NantOnomics.

41. In January 2014, Soon-Shiong's NantBiosciences inked a strategic collaboration agreement with Celgene, under which Celgene made a $75 million upfront investment in NantBiosciences and licensed two molecules to Nantbiosciences in exchange for the option to purchase certain drugs in

---

[6] Abraxis is the successor to a company that Soon-Shiong founded in 2001 also called Abraxis Bioscience. In 2007, Soon-Shiong restructured Abraxis Bioscience into two publicly traded companies, Abraxis Bioscience, Inc. (sold to Celgene in 2010) and Abraxis Pharmaceutical Products, Inc. (sold to German healthcare conglomerate Fresenius SE in 2008 for $4.6 billion in cash and stock).

development by Nantbiosciences. Celgene's CEO, Bob Hugin, stated that Celgene entered into the deal because of Soon-Shiong: "Celgene is excited to team up again with Dr. Patrick Soon-Shiong, the creator of Abraxane and the founder of the nab technology platform. We are committed to his vision of molecularly driven personalized medicine . . . ."[7]

42. In June 2014, Celgene made a strategic $25 million investment in another Soon-Shiong entity, NantHealth. Again, Celgene credited Soon-Shiong as the reason for this investment. Jacqualyn Fouse, Celgene CFO, stated "Celgene is excited to invest once again in Dr. Soon-Shiong's vision . . . ."[8]

**Soon-Shiong Takes Over Conkwest,**
**Rebrands As NantKwest Right Before IPO**

43. NantKwest, formerly known as Conkwest, is a clinical-stage immunotherapy company focusing on the use of "natural killer cells" to treat cancer, infectious diseases, and inflammatory diseases. NantKwest claims that "natural killer cells" can identify and destroy cancer and virally-infected cells. The Company describes its "natural killer cells" platform as an "off-the-shelf" therapy that does not rely on a patient's immune system. While NantKwest has successfully completed a Phase I clinical trial, and seeks to initiate Phase II and III trials for some of its products, the Company does not currently market any FDA approved drugs to the public. Like Soon-Shiong's other "Nant"-branded entities,

---

[7] *See* "NantBiosciences inks cancer collaboration with Celgene," available at http://www.ddn-news.com/index.php?newsarticle=8099.

[8] *See* NantHealth press release dated June 10, 2014, available at http://nanthealth.com/celgene-makes-landmark-investment-nanthealth-advance-groudbreaking-cancer-research-patients/.

NantKwest claims to be revolutionary but has "delivered little so far but big losses and outsize executive pay."[9]

44. Soon-Shiong took over NantKwest via a series of transactions using his related entities, beginning with a joint development and investment agreement between NantKwest and Sorrento, a pharmaceutical company in which Soon-Shiong is, and was at the time of the IPO, the largest shareholder. On December 16, 18, and 23, 2014, Soon-Shiong caused Sorrento to purchase a total of 5,618,326 shares of NantKwest Class A common stock in exchange for an investment of $10 million. Pursuant to the purchase agreement, Sorrento had the right to designate a director to NantKwest's Board, so long as it retained more than 462,875 NantKwest shares. Sorrento was the second-largest shareholder of NantKwest at the time of the IPO, and remained so until June 30, 2016, when it transferred 5,618,326 NantKwest shares to a foundation controlled by Soon-Shiong, along with more than $15 million in cash, in exchange for the foundation's shares in Sorrento and the forfeiture of rights by Soon-Shiong's investment vehicle Cambridge to acquire 500,000 shares of Sorrento. *See* Schedule 13D/A filed on July 11, 2016.

45. In December 2014, Sorrento exercised its designation right to name Defendant Ji as a Director of NantKwest.

46. On December 23, 2014, Soon-Shiong arranged for his investment vehicle, Cambridge, to purchase an aggregate of 25,191,473 Class A shares at $1.89 per share for a total investment of approximately $47.5 million. Soon-Shiong

---

[9] Max Nisen, "Soon-Shiong's Latest Offering Is Risky," *Bloomberg Gadfly* (June 2, 2016, 2:32 PM CDT), http://www.bloomberg.com/gadfly/articles/2016-06-02/nanthealth-ipo-patrick-soon-shiong-s-risky-bet.

personally negotiated this transaction as the sole member of MP 13 Ventures, the general partner of Cambridge. As a result of this investment and his role in the Sorrento transactions, Soon-Shiong was named a Director and Co-Chairman of NantKwest in December 2014.

47. Soon-Shiong consolidated his control over NantKwest in the months that followed. In January 2015, Soon-Shiong was appointed NantKwest's Chief Medical Officer. In March 2015, Soon-Shiong was appointed as NantKwest's CEO and sole Chairman.

48. Also in March 2015, Soon-Shiong negotiated a series of related-party transactions to flip interests in an unprofitable development-stage pharmaceutical company called Inex Bio to NantKwest at a massive personal profit for himself and for Defendant Ji. In February and March 2015, Soon-Shiong and Ji formed a holding company called InexBio Holdings LLC that acquired a controlling stake in Inex Bio from third party stockholders for $1.1 million. In March 2015, Soon-Shiong and Ji sold the same stake for which they had paid $1.1 million to NantKwest for $6.5 million in cash and warrants to purchase 2,609,520 shares of NantKwest Class A common stock for only $2 per share. Soon-Shiong and Ji promptly exercised these warrants. Soon-Shiong and Ji have not explained why it was necessary or appropriate for them to derive a personal benefit from these transactions, or how these transactions were consistent with the fiduciary duties that each owed NantKwest as a Director. Inex Bio has not completed any clinical trials and derives no revenues from any products. In its 2015 Form 10-K, NantKwest absorbed losses associated with Inex Bio on its consolidated balance sheet.

49. On or about March 24, 2015, NantKwest granted Soon-Shiong a Common Stock Purchase Warrant. According to the Company's explanation at the end of the Class Period, the warrant terms and milestones were modified by "mutual agreement" on May 8, 2015 in order to ensure an additional windfall to Soon-Shiong. *See* 2016 Form 10-K, Note 13. The modified warrant agreement was attached to the Registration Statement as Exhibit 10.16. However, to obscure the circumstances of the modification from investors, Exhibit 10.16 was backdated to the original March 24, 2015 date, made no reference to any modification, and did not disclose that the largest grant condition was already probable. Exhibit 10.16 described the warrant vesting criteria as follows:

> i. 100,000 Warrant Shares per month for a period of 40 months beginning April 1, 2015 (for a total of 4,000,000 Warrant Shares).
>
> ii. 4,500,000 Warrant Shares upon the closing of transaction between the Company and an internationally recognized pharmaceutical, specialty pharmaceutical or biotechnology company with annual sales of at least $5 billion (a "Strategic Partner"), during the term of the Holder's service as CEO or Chairman of the Company, in which a Strategic Partner invests at least US$20 million in shares of Company capital stock at or above a pre-money valuation of $1.5 billion.
>
> iii. 700,000 Warrant Shares upon qualification of a cGMP manufacturing facility capable of cell production for the Company's aNK, haNK or taNK product candidates.
>
> iv. 100,000 Warrant Shares upon the submission by the Company after the Issue Date of an investigational new drug (IND) application to the FDA for any of the Company's aNK, haNK or taNK product candidates.

> v. 100,000 Warrant Shares upon the submission by the Company after the Issue Date of a protocol for a Phase II clinical trial to the FDA for any of the Company's aNK, haNK or taNK product candidates, excluding the Company's currently contemplated MCC phase II clinical trial (Merkel cell).
>
> vi. 100,000 Warrant Shares upon execution of a partnership, collaboration or other strategic agreement with a pharmaceutical, specialty pharmaceutical or biotechnology company with respect to any of the Company's aNK, haNK or taNK product candidates, excluding the equity financing transaction contemplated in clause ii above.

*See* Exhibit 10.16 to Form S-1 filed with the SEC on June 19, 2015 (quoted verbatim without adjustment to reflect pre-IPO stock split).[10] The stated strike price for each of these warrants was $3.70, or approximately $2.00 after giving effect to the July 10, 2015 1.8515-to-1 forward split.

50. Accounting rules clearly and unquestionably prevent companies from deferring windfall compensation to executives by labeling it "performance" compensation but setting the "performance" condition to one that is already probable at the outset, or soon thereafter. Under Accounting Standards Codification ("ASC") 718-10-25-20, "[a]ccruals of compensation cost for an award with a performance condition shall be based on the probable outcome of that performance condition-compensation cost shall be accrued if it is probable

---

[10] Later references in NantKwest's SEC filings refer to warrants to purchase up to 17,589,250 shares. Plaintiffs understand these changes to reflect NantKwest's 1.8515:1 forward split of common stock prior to the IPO, as 9,500,000 x 1.8515 equals 17,589,250.

that the performance condition will be achieved and shall not be accrued if it is not probable that the performance condition will be achieved."[11]

51. When the Company, Soon-Shiong, and Directors and Compensation Committee members Kusserow, Potts, and Rosen agreed on May 8, 2015 to modify Soon-Shiong's warrant conditions to create a windfall grant of 8,331,750 shares (4,500,000 pre-split), conditioned upon an already-probable strategic partner investment, they caused the Company to incur massive, related-party compensation expense at that time. The satisfaction of this so-called "milestone" condition was already probable (if not certain) as of the May 8, 2015 date of the modification due to: (a) Soon-Shiong's history with Celgene, including his influence as Celgene's largest individual investor; (b) the numerous investments that Celgene had made in Soon-Shiong entities in amounts greater than $20 million; (c) Celgene's repeated public statements about its desire to invest in Soon-Shiong's "vision," *see, e.g.*, ¶¶ 50-51; and (d) on information and belief due to the timing of Celgene's two investments soon after the May 8, 2015 modification, the fact that at least preliminary discussions regarding the strategic investment had already taken place. Accordingly, under the clear-cut provisions of ASC 718-10-25-20, NantKwest incurred and was required to record over $100 million in related-party compensation expense well before the IPO and the Registration Statement.

[11] This assessment of probability must be done at the time at which there is mutual agreement as to the key terms (here, May 8, 2015 as to the modified terms), which is considered the "grant date" for purposes of the applicable accounting rules, *see* ASC 718-10-25-5.

52. On or about May 22, 2015, NantKwest entered into an employment agreement with Soon-Shiong.

53. Also in May 2015, Soon-Shiong caused NantKwest to enter into a Related-Party Lease arrangement with NantWorks to lease approximately 9,500 square feet of space in the Culver City, California facility in which Soon-Shiong keeps his personal office, and that also serves as headquarters to Cambridge, NantWorks, NantHealth, and other Soon-Shiong entities. The Related-Party Lease was not documented until November 2015, but the documentation conceded it was effective in May 2015.

54. In May 2015, when Soon-Shiong and NantKwest decided that NantKwest would lease space in the Culver City, California facility, the space was configured for conventional office usage. However, because NantKwest needed a laboratory configuration, in May and June 2015, millions of dollars of structural conversions were made for which NantKwest was liable.

55. Confidential witnesses have confirmed that construction to convert this space from office usage to a laboratory configuration was ongoing in May and June 2015. For example, Confidential Witness Number ("No.") 1 ("CW-1"), a former NantWorks employee who worked at the Culver City facility from April 2015 through November 2015, explained that the first floor of the building was under construction throughout CW-1's employment and that CW-1 had heard it was to be used for laboratory space. Similarly, Confidential Witness No. 2 ("CW-2"), a former Nantmobile employee who worked at the Culver City facility from August 2014 through August 2015, reported that construction at the building was "constant" and that employees understood the construction was for lab space.

56. Yet, neither the fact of the Related-Party Lease arrangement nor the millions of dollars of liability already incurred were disclosed at the time of the IPO. A subsequent documentation of the Related-Party Lease concedes that "[t]he facility license agreement with NantWorks for approximately 9,500 square feet of office space in Culver City, California . . . is ***effective as of May 22, 2015***." *See* Form 10-Q filed on November 12, 2015 (emphasis added).

57. In June 2015, Soon-Shiong caused NantKwest to enter into related-party agreements with three other of his entities: NantOmics, NantCell and NanoCav.

58. On or about June 10, 2015, NantKwest sold $71 million worth of shares in a private placement, including an investment of $7,999,979.30 by a subsidiary of Celgene.

59. On June 18, 2015, NantKwest granted Soon-Shiong's investment entity, Cambridge, the formal right to nominate a director to the Board, so long as Cambridge directly owned more than 20% of NantKwest's common stock. Soon-Shiong designated himself under this provision.

60. In June 2015, NantKwest also used entities formed by Soon-Shiong to facilitate spin-outs of non-core businesses. NantKwest spun out its businesses that relate to its testing and diagnostic products and services and veterinary oncology, and transferred all of its existing revenue-earning license agreements to Brink Biologics, Inc. ("Brink Biologics") and Coneksis, Inc. ("Coneksis"), respectively. Soon-Shiong had a controlling interest in both Brink Biologics and Coneksis at the time these transactions were consummated.

61. On July 9, 2015, the Company entered into a second private placement agreement with the same subsidiary of Celgene that had participated in the June 2015 private placement, providing that the Celgene subsidiary would purchase an additional $17 million worth of NantKwest shares concurrent with NantKwest's IPO.

62. On July 10, 2015, the Company changed its name from Conkwest to NantKwest to align its branding with that used by NantWorks and its umbrella of subsidiaries.

63. On July 13, 2015, the Company entered into an amended executive employment agreement with Soon-Shiong. The amended executive employment agreement did not mention the modification of warrant vesting terms to which Soon-Shiong and the Company had mutually agreed on May 8, 2015, or that the modified conditions were designed to be probable when made, causing the Company to incur over one hundred million dollars of compensation expense. *See* Exhibit 10.5 to Form S-1/A filed on July 15, 2015.

64. On July 16, 2015, the Company filed the final, full Registration Statement with the SEC on Form S-1/A.

65. On or about July 23, 2015, the Company sent a letter to the SEC requesting that the SEC accelerate the effectiveness of its Registration Statement.[12] The letter, which was signed by Simon and copied Soon-Shiong, expressly acknowledged the Company's "full responsibility for the adequacy and accuracy of the disclosure in the Registration Statement."

---

[12] The letter itself is dated July 23, 2015. The SEC's EDGAR system dates the letter as July 24, 2015. The disparity is not relevant to this litigation.

66. On July 27, 2015, NantKwest filed a Form S-1MEF with the SEC to increase the number of shares offered in its IPO by 1,481,200 shares, including 193,200 shares issuable on the exercise of an option granted to the underwriters to purchase additional shares.

**SEC Rules And GAAP Mandated Disclosure**
**Of The Warrant Expense And Related-Party Lease**

67. Generally Accepted Accounting Principles ("GAAP") are the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

68. SEC rules and regulations require that publicly traded companies include financial statements that comply with GAAP in their annual and quarterly filings with the SEC. *See* § 13 of the Exchange Act (15 U.S.C. § 78m); Rule 10-01(d) of Regulation S-X (17 C.F.R. § 210.10-01(d)). SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

69. Accounting standards recognize that events occurring subsequent to the close of financial statements can be crucial to investors, and consequently require the disclosure of two types of subsequent events. First, an entity is required to both recognize in financial statements and disclose subsequent events that "provide additional evidence of events that existed at the date of the balance sheet, including estimates inherent in the process of preparing financial statements." *See* ASC No. 855. Second, accounting standards also acknowledge that some subsequent events arising after the date of the balance sheet, and thus not yet

recognized in the financial statements, are "of such a nature that they must be disclosed to keep the financial statements from being misleading." *Id.* For this second type of subsequent event, an issuer is required to disclose both "[t]he nature of the event" and "[a]n estimate of its financial effect, or a statement that such an estimate cannot be made." *Id.*

70. ASC No. 850 provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." ASC 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. ASC 850-10-20. Management is defined as "[p]ersons who are responsible for achieving the objectives of the enterprise and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the board of directors, the chief executive officer, chief operating officer, vice presidents in charge of principal business functions (such as sales, administration, or finance), and other persons who perform similar policymaking functions. Persons without formal titles also may be members of management." ASC 850-10-20.

71. According to GAAP, disclosures of related-party transactions must include: (a) the nature of the relationship involved; (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements; (c) the dollar amount of transactions for each of the

periods for which income statements are presented; and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

72. SEC Regulation S-K ("Reg. S-K"), together with the General Rules and Regulations under the Securities Act and Exchange Act and the Forms under these Acts, states the requirements applicable to the content of the non-financial statement portions of registration statements on Form S-3 and quarterly reports. *See* 17 C.F.R. § 229.10. Item 404 of Reg. S-K ("Item 404") requires the disclosure of detailed information concerning related-party transactions in which the amount[13] involved exceeds $120,000, including the names of the "related person" or entity participating in the transaction, the related person's interest in the transaction, including related person's position, relationship or ownership in the other entity that is a party to the transaction, and the amount involved in the transaction. *See* 17 C.F.R. § 229.404(a). A "related person" under Item 404 is defined to include any director or executive officer of the company, any nominee for director, any immediate family member of a director or executive officer of the registrant, or of any nominee for director, or any person who is known to the registrant to be the beneficial owner of more than five percent of any class of the registrant's voting securities (*i.e.*, a 5% or greater shareholder), or the immediate family member of such beneficial owner. *See* instruction 1 to 17 C.F.R. § 229.404(a); 17 CFR 229.403(a).

---

[13] The term "amount," when used in regard to securities, means the principal amount if relating to evidences of indebtedness, the number of shares if relating to shares, and the number of units if relating to any other kind of security. *See* 17 CFR § 270.8b-2(a).

73. Finally, Section 210.4-08(k) of Regulation S-X ("Reg. S-X") also mandates that "[r]elated party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows[,]" in documents prepared pursuant to the Securities Act, including prospectuses and registration statements. Reg. S-X explicitly adopts the FASB's definition of related parties. *See* 17 CFR § 210.1-02.

**Defendants Use Material Misstatements And Omissions In The <u>Registration Statement To Sell NantKwest Shares To Public Investors</u>**

74. On July 28, 2015, Defendants sold 9,531,200 shares of common stock in an IPO pursuant to the Registration Statement. The Registration Statement contained untrue statements of material facts and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made.

75. With respect to the warrants granted to Soon-Shiong, the Registration Statement stated:

> Dr. Soon-Shiong's employment agreement provides that, in consideration of Dr. Soon-Shiong's appointment as Chief Executive Officer, on March 24, 2015 we granted or will grant to Dr. Soon-Shiong the following equity awards:
>
> * * *
>
> • A warrant to purchase up to 17,589,250 shares of the Company's common stock at an exercise price of $2.00 was issued to Dr. Soon-Shiong on March 24, 2015. The warrant will vest as follows: (i) 7,406,000 shares will vest monthly over a period of 40 months beginning April 1, 2015; and (ii) up to 10,183,250 shares will vest based upon achievement of certain strategic, manufacturing, clinical development and regulatory milestones.

76. The statements identified in Paragraph 75 above were materially false and misleading when made because they omitted the following material information necessary to make them not misleading under the circumstances in which they were made: (a) that pursuant to the secretly-modified warrant vesting terms, the vesting of more than 8.3 million warrant shares was already probable at the time of modification; and (b) as a result, Soon-Shiong had already received an enormous windfall by the warrant modification, and the Company had already incurred a similarly large executive compensation expense.

77. The Registration Statement also stated with respect to Soon-Shiong's equity compensation:

> [T]he options, warrant, and restricted stock units to purchase or receive common stock held by our Chairman and Chief Executive Officer may entitle him to acquire up to an aggregate of 20.9 million shares of our common stock (including equity awards for 1.5 million shares that will be granted and begin vesting effective upon the closing of this offering).

78. The statements identified in Paragraph 77 above were materially false and misleading when made because they omitted the following material information necessary to make them not misleading under the circumstances in which they were made: (a) that pursuant to the secretly-modified warrant vesting terms, the vesting of more than 8.3 million warrant shares was already probable at the time of modification; and (b) as a result, Soon-Shiong had already received an enormous windfall by the warrant modification, and the Company had already incurred a similarly large executive compensation expense.

79. The Registration Statement expressly encouraged investors to look at "the exhibits filed as a part of the registration statement" for further information,

but those exhibits were also materially misleading and incomplete. In particular, with respect to Soon-Shiong's warrant compensation, Defendants attached as Exhibit 10.5 to the Registration Statement the employment agreement, as amended, between Soon-Shiong and NantKwest, and attached as Exhibit 10.16 the Common Stock Purchase Warrant dated March 24, 2015.

80. The aforementioned exhibits contained materially false and misleading statements because they omitted the following material information necessary to make them not misleading under the circumstances in which they were made: (a) that the warrant terms were modified on May 8, 2015; (b) that pursuant to the secretly-modified warrant vesting terms, the vesting of more than 8.3 million warrant shares was already probable at the time of modification; and (c) as a result, Soon-Shiong had already received an enormous windfall by the warrant modification, and the Company had already incurred a similarly large executive compensation expense.

81. The Registration Statement described the Company as having "certain operations in Culver City, California." This statement was materially misleading when made because it omitted the following facts necessary to make this statement not misleading under the circumstances in which it was made: (a) the Company had engaged in a Related-Party Lease arrangement beginning in or around May 2015 so that it could operate out of the same facility that was headquarters to Cambridge, NantWorks, NantHealth, and other Soon-Shiong companies; and (b) NantKwest had already incurred millions of dollars of liability to make structural changes to transform the leased space to laboratory use.

82. The Registration Statement described the Company's "Facilities" and their associated expenses as follows:

> We lease a total of approximately 2,550 square feet of office space at 2533 South Coast Highway 101, Cardiff-by-the-Sea, California 92007, for general office use, pursuant to an operating lease. The term of the amended lease is from September 1, 2013 to August 31, 2016. Our total monthly lease payment is currently $11,904 per month, subject to a 3.5% annual increase.
>
> We entered into a Lease Agreement dated June 19, 2015 with ARE-John Hopkins Court, LLC for an approximately 44,681 rentable square foot building located at 3530 John Hopkins Court, San Diego, California 92121. The permitted use is research and development laboratory, related office and other related uses. The term of the lease extends for seven years commencing on August 1, 2016 and requires us to pay base monthly rent in the amount of $178,724 per month, with three percent (3%) annual increases on each anniversary of the lease commencement date. The lease is conditioned upon the satisfaction of the following conditions precedent prior to July 31, 2015: (i) the execution and delivery of a sublease for our use of the building during the period prior to the lease commencement date and a consent to that sublease among the landlord, current tenant and us and (ii) the execution and delivery of an amendment to the current tenant's lease providing for the early termination of that lease.

83. The statements identified in Paragraph 82 above were materially misleading when made because they omitted the following facts necessary to make the statements not misleading under the circumstances in which they were made: (a) the Company had engaged in a Related-Party Lease arrangement beginning in May 2015 so that it could operate out of the same facility that was headquarters to Cambridge, NantWorks, NantHealth, and other Soon-Shiong companies; and (b) NantKwest had already incurred millions of dollars of liability as a result of making structural changes to transform the leased space to laboratory use.

84. The "Subsequent Events" section of the Registration Statement stated that the Company "evaluated subsequent events through May 14, 2015," ***and again*** "updated its evaluation of subsequent events through July 15, 2015." Both reviews, therefore, were after the May 8, 2015 warrant modification that caused NantKwest to accrue more than $100 million in additional compensation expense, including more than $43 million not revealed until the end of the Class Period. Although the fact that NantKwest changed Soon-Shiong's warrant terms to enhance his compensation, and the fact that these modifications caused more than $100 million in related-party compensation expense required disclosure under ASC No. 855, neither were mentioned in the Registration Statement. Instead, the Registration Statement affirmatively represented that "***There are no additional significant events that require disclosure,***" except as otherwise provided in that section.

85. The statements identified in Paragraph 84 above were materially false and misleading when made because the Company had not, in fact, updated its evaluation of subsequent events to incorporate all significant events through July 15, 2015, and because they omitted the following material facts necessary to make the statements not misleading under the circumstances in which they were made: (a) the modification of warrant terms created a windfall grant of approximately 8,331,750 warrant shares (split-adjusted) to Soon-Shiong, which was already probable at the time of the May 8, 2015 modification, triggering more than $100 million of additional compensation expense to NantKwest (including more than $43 million concealed until the Restatement) and a similarly large windfall to Soon-Shiong; (b) in May 2015, during the second quarter of 2015, NantKwest began to lease space from its related party, NantWorks; and (c) NantKwest incurred

millions of dollars in liability as a result of making structural modifications to the facility subject to the Related-Party lease arrangement, rendering it the owner of that space for accounting purposes.

86. The Registration Statement further stated that the financial statements contained therein were "prepared in accordance with accounting principles generally accepted in the United States." This statement was materially false and misleading when made because the "Subsequent Events" note to the financial statements, which the Registration Statement expressly acknowledged was "an integral part" of the financial statements, was not prepared in accordance with GAAP in that it failed to properly disclose the Related-Party Lease and the full measure of related-party compensation as GAAP requires.

87. The Registration Statement stated the following with respect to NantKwest's internal controls:

> In connection with the preparation of our financial statements for the three months ended March 31, 2015, we concluded that there were material weaknesses in our internal control over financial reporting. A material weakness is a significant deficiency, or a combination of significant deficiencies, in internal control over financial reporting such that it is reasonably possible that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weaknesses that we identified related to (1) our chief financial officer having almost complete responsibility for the processing of financial information and (2) our finance department not having adequate staff to process in a timely manner complex, non-routine transactions, including accounting for our investment in and asset purchase of Inex Bio.

88. The statements identified in Paragraph 87 above were materially misleading when made because they omitted the following facts necessary to make the statements not misleading under the circumstances in which they were made:

(a) NantKwest's material weaknesses extended beyond the ability to timely process "complex, non-routine transactions;" and (b) NantKwest's material weaknesses had already caused the Company to improperly account for Soon-Shiong's equity compensation, a highly routine accounting measure addressed by nearly every public company (and to improperly account for build-to-suit lease liability).

89. As a result of this materially false and misleading Registration Statement, NantKwest was able to raise over $225 million in its public offering.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

90. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired NantKwest common stock pursuant and/or traceable to NantKwest's Registration Statement issued in connection with its July 28, 2015 IPO, seeking to pursue remedies under §§ 11 and 15 of the Securities Act. Excluded are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

91. Class members are so numerous that joinder of all members is impracticable. Throughout the Class Period, NantKwest common stock was actively traded on the NASDAQ Global Select Market. According to NantKwest's Form 10-K filed on March 30, 2016, it had 83 holders of record. Because the overwhelming majority of owners hold shares in street name, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Potential Class members may be identified from records maintained by NantKwest, their transfer

agents, and brokers and banks that hold shares beneficially for investors in street name, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

92. Plaintiffs' claims are typical of the claims of those of the Class, as all Class members were similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

93. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

94. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether the Registration Statement contained any material misrepresentations or omissions;
- whether the Individual Defendants or Underwriter Defendants have a viable good faith defense to the strict liability otherwise imposed by Section 11 of the Securities Act;
- whether Defendants can establish negative causation as a defense to or as a reduction of the strict liability otherwise imposed by Section 11 of the Securities Act;
- whether Soon-Shiong was a control person of NantKwest for purposes of Section 15 of the Securities Act; and
- whether the federal securities laws were violated by Defendants' acts as alleged herein.

95. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**(Against NantKwest, the Individual Defendants, and the Underwriter Defendants for Violation of Section 11 of the Securities Act)**

96. Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

97. This claim is asserted by Plaintiffs against all Defendants on behalf of all persons who purchased shares of the Company's common stock pursuant to and/or traceable to the Company's IPO, in which the shares registered under the Registration Statement were sold.

98. The Individual Defendants are strictly liable under the Securities Act as signatories of the Registration Statement for the misrepresentations and omissions contained therein, as identified in Paragraphs 83 to 98 above.

99. NantKwest is strictly liable as the Issuer under the Securities Act for the misrepresentations and omissions it made in the Registration Statement, as identified in Paragraphs 74 to 89.

100. The Underwriter Defendants are strictly liable under the Securities Act as named underwriters for the misrepresentations and omissions made in the Registration Statement, as identified in Paragraphs 74 to 89.

101. None of the Defendants named herein conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements

contained in the Registration Statement and identified in Paragraphs 74 to 89 above were true, were without omissions of material fact or were otherwise not misleading.

102. By reason of the conduct alleged herein, each of the Defendants has violated Section 11 of the Securities Act.

103. Plaintiffs and the Class have sustained damages because the value of their NantKwest common stock has declined. This decline is attributable by law to Defendants in the absence of proof that it was caused by other factors, which proof has not been established.

104. At the time of their purchases, Plaintiffs and the Class were without knowledge of the wrongful conduct alleged herein, and could not have reasonably discovered those facts more than one year prior to the filing of the initial complaint in this action. The initial complaint was filed within three years of the time that NantKwest offered the shares covered by the Registration Statement to the investing public.

105. By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

### (Against Soon-Shiong and Gomberg for Violation of Section 15 of the Securities Act)

106. Plaintiffs repeat and reallege each allegation contained in the above paragraphs as if fully set forth herein.

107. Soon-Shiong, by virtue of his office, directorship, controlling interest in NantKwest, relationship with other directors and executives (in particular Ji and Simon, as set forth above), related-party transactions, controlling interest in companies providing vital services to NantKwest, and proven ability to shape the structure and operations of NantKwest is a controlling person of NantKwest within the meaning of Section 15 of the Securities Act.

108. Gomberg, as the Chief Financial Officer at the time of the IPO, exercised "almost complete responsibility for the processing of financial information" according to the Registration Statement. Consequently, he was a controlling person of NantKwest within the meaning of Section 15 of the Securities Act. Gomberg also claims in his LinkedIn profile to have "[l]ed the S-1 drafting and due diligence activities" at NantKwest.[14]

109. By virtue of the conduct alleged herein, Defendants Soon-Shiong and Gomberg are liable as control persons for the primary violations of Section 11 by NantKwest, as alleged in Count I.

110. Soon-Shiong and Gomberg did not conduct a reasonable investigation or possess a reasonable basis for the belief that the statements contained in the Registration Statement and identified in Paragraphs 74 to 89 above were true, were without omissions of material fact, and were not misleading.

111. Each of these Defendants is liable to the Plaintiffs and the Class for damages suffered as a result of the primary Securities Act violations of NantKwest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

---

[14] *See* https://www.linkedin.com/in/richgomberg/.

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: August 24, 2018

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Kara M. Wolke*
Robert V. Prongay
Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com
kwolke@glancylaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone: (818) 532-6449
E-mail: jpafiti@pomlaw.com
Patrick V. Dahlstrom
Joshua B. Silverman
Omar Jafri
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
E-mail: pdahlstrom@pomlaw.com
jbsilverman@pomlaw.com
ojafri@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Email: jalieberman@pomlaw.com
ahood@pomlaw.com

**BRAGAR EAGEL & SQUIRE P.C.**
Jeffrey H. Squire
David J. Stone (SBN 208961)
Melissa A. Fortunato (SBN 319767)
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5858
Email: squire@bespc.com
stone@bespc.com
fortunato@bespc.com

***Attorneys for Plaintiffs***

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On August 24, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 24, 2018, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke

# Mailing Information for a Case 2:16-cv-01947-MWF-JEM Sunil Sudunagunta v. Nantkwest, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sheryl S Bassin**
  sbassin@wsgr.com
- **Patrice L Bishop**
  service@ssbla.com,ssblaservice@gmail.com,pbishop@ssbla.com
- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com
- **Cynthia Ann Dy**
  cdy@wsgr.com
- **Boris Feldman**
  boris.feldman@wsgr.com,abenjamin@wsgr.com,cwininger@wsgr.com,cdy@wsgr.com,ncarvalho@wsgr.com
- **Melissa A Fortunato**
  fortunato@bespc.com,ecf@bespc.com
- **Michael M Goldberg**
  michael@goldberglawpc.com,dmacdiarmid@glancylaw.com,info@glancylaw.com,brian@goldberglawpc.com
- **Todd H Henderson**
  henderson@bespc.com,ecf@bespc.com
- **J Alexander Hood , III**
  ahood@pomlaw.com,abarbosa@pomlaw.com
- **James I Jaconette**
  jamesj@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Omar Jafri**
  ojafri@pomlaw.com
- **Olivia M Kim**
  okim@wsgr.com,megutierrez@wsgr.com,ctong@wsgr.com,anavarro@wsgr.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com
- **Vahe Mesropyan**
  vmesropyan@glancylaw.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Michael R Petrocelli**
  mpetrocelli@wsgr.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,robert-prongay-0232@ecf.pacerpro.com
- **Kevin F Ruf**
  kruf@glancylaw.com,info@glancylaw.com,kevinruf@gmail.com
- **James C Rutten**
  james.rutten@mto.com,erin.cox@mto.com
- **Gideon A Schor**
  gschor@wsgr.com
- **Joshua B Silverman**
  jbsilverman@pomlaw.com
- **Cali D Tran**
  ctran@wsgr.com,aduff@wsgr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Brian Schall**
Goldberg Law PC
1999 Avenue of the Stars Suite 1100
Los Angeles, CA 90067